OPINION OF THE COURT
Patrick H. NeMoyer, J.
The plaintiff P. Jeffrey Lewis, M.D. (Lewis) entered into a *813 participating physician agreement (PPA) with the defendant Individual Practice Association of Western New York, Inc. (IPA) on October 17, 1996 to provide medical services to clients of defendant Independent Health Association, Inc. (IHA). IHA is a health maintenance organization (HMO) established pursuant to article 44 of the Public Health Law. IPA was established to coordinate and provide health care services to IHA’s enrollees.
The term of the PPA was until December 31, 1996, with automatic renewal for periods of one year, unless either party notifies the other party of their intention to terminate the contract at least 60 days before the December 31st annual renewal date.
The PPA provides that “Termination under this Paragraph 10(a) may be with or without cause and is not subject to the medical grievance procedure.”
Public Health Law § 4406-d, passed in 1996 (L 1996, ch 705) and effective as of January 1, 1997, provides in subdivision (3):
“Either party to a contract may exercise a right of non-renewal at the expiration of [a] * * * contract without a specific expiration date, on each January first occurring after the contract has been in effect for at least one year, upon sixty days notice to the other party; provided, however, that any non-renewal shall not constitute a termination for purposes of this section.”
Public Health Law § 4406-d (2) provides for certain rights and protections for the health care professional in case of terminations other than nonrenewals. The health care professional is entitled to notice of proposed termination with reasons for the action, the right to a hearing before at least a three-member panel, including a clinical peer, in a specified time period (30 days after demand) and a decision from the panel in a timely manner.
IPA invoked its right not to renew the contract with Lewis in compliance with the contract and the statute. It is undisputed that IPA’s actions constituted a nonrenewal and not a termination, thus relieving IPA of the duty to articulate a reason for nonrenewal and provide a hearing, as required in the case of a termination. (Public Health Law § 4406-d [2].)
However, Public Health Law § 4406-d (5) provides that:
“No health care plan shall terminate a contract or employment, or refuse to renew a contract, solely because a health care provider has:

*814
“(a) advocated on behalf of an enrollee\

“(b) filed a complaint against the health care plan;
“(c) appealed a decision of the health care plan;
“(d) provided information or filed a report pursuant to [Public Health Law § 4406-c], or
“(e) requested a hearing or review pursuant to this section.” (Emphasis supplied.)
Lewis contends that the reason for the nonrenewal of his contract with IPA was his patient advocacy, in violation of Public Health Law § 4406-d (5) (a). Lewis seeks a declaratory judgment as to his contractual rights under this statute and the resulting scope of discovery to be allowed in this case.
Lewis’ interpretation of Public Health Law § 4406-d (5) appears to constitute a “but/for” test. In other words, Lewis believes he must demonstrate that IPA would have renewed his contract but for his patient advocacy. Lewis goes further to argue that IPA must demonstrate that patient advocacy played no part whatsoever in IPA’s decision not to renew. As a result of this interpretation, Lewis requests full disclosure of the provider review criteria used by IPA, which are required to be developed by IPA, pursuant to Public Health Law § 4406-d (4).
In contrast, IPA contends that they must simply show that there was another articulable reason for nonrenewal, even if patient advocacy factored into their decision not to renew. They point to the word “solely” in section 4406-d (5) as support for their contention that patient advocacy must be the one and only reason for nonrenewal in order for there to be a violation of the statute.
In this regard, IPA contends that Lewis’ performance standards were a concern during the contractual period and ultimately led to his nonrenewal. IPA offers evidence that Lewis was notified prior to the nonrenewal of their dissatisfaction with his performance, as judged by IPA’s internal business monitoring procedures. Therefore, under IPA’s interpretation, even if patient advocacy was a consideration, or even the primary reason, the articulation of another reason precludes any violation of the patient advocacy provision of the statute.
Clearly, the parties have different interpretations of the relevant statutory language: “No health care plan shall terminate a contract or employment, or refuse to review a contract, solely because a health care provider has: (a) advocated on behalf of an enrollee.” The court agrees this language is subject to more than one reasonable interpretation.
*815 Where statutory language is subject to various interpretations, it is the court’s primary responsibility to ascertain and give effect to the intention of the Legislature (McKinney’s Cons Laws of NY, Book 1, Statutes § 92 [a]). The court in determining legislative intent first looks at the words used and their normal meaning. However, in certain instances the literal meaning of statutory language must give way to effectuate the legislative intent. The meaning of words may be enlarged or restrained in light of the legislative intent. The language of a statute may be freely dealt with since the words of a statute should be subservient to legislative intent and not contrary to it (Travelers’ Ins. Co. v Padula Co., 224 NY 397; Archer v Equitable Life Assur. Socy., 218 NY 18; Riggs v Palmer, 115 NY 506; McKinney’s Cons Laws of NY, Book 1, Statutes §§ 94, 111, 234).
The court in construing a statute should consider the mischief sought to be remedied by the statutory enactment and the court should construe the language in question so as to suppress the evil and advance the remedy (McKinney’s Cons Laws of NY, Book 1, Statutes § 95; Matter of New York Life Ins. Co. v State Tax Commn., 80 AD2d 675, affd 55 NY2d 758).
It is clear that the evil sought to be remedied was the termination or nonrenewal of health care providers for advocating on behalf of their patients.
The statutory language at issue was passed by the State Legislature as chapter 705 of the Laws of 1996 and is commonly known as the New York Health Care Protection Act. The Governor’s Memorandum in Support of approving the Act states: “This landmark bill, part of my legislative program for 1996, provides comprehensive protection for our State’s health care consumers and health care providers.” (Bill Jacket, L 1996, ch 705.)
A letter written by Accessible, a coalition of voluntary health organizations, to Governor Pataki states: “No longer will managed care companies be able to impose ‘gag orders’ that restrict a health care provider from discussing treatment options with patients and HMOs will not be permitted to penalize providers for advocating specific treatments for patients.” (Bill Jacket, L 1996, ch 705.)
The Division of Budget recommendation on the Act provides “HMOs would be prohibited from using ‘gag orders’ to restrict providers’ discussion of treatment options with patients. They could not penalize providers for advocating specific treatments or for filing a complaint with the government about the quality of care.” (Bill Jacket, L 1996, ch 705.)
*816 The Governor’s Program Bill Memorandum provides under purpose: “ban limitations imposed by HMOs or insurers on a health care providers’ right to advocate to the HMO or insurer on behalf of the patient.” (Bill Jacket, L 1996, ch 705.) Under summary of provisions the Memorandum provides: “An HMO’s decision to not renew a contract which has expired, or to terminate an automatically renewing contract, is not considered a termination for purposes of this section * * * Finally, HMOs are prohibited from terminating or refusing to renew a contract solely because a provider advocated on behalf of a patient, filed a complaint, appealed a plan decision, provided information or a report to an appropriate agency, or requested a hearing or review pursuant to the provider due process section.” (Bill Jacket, L 1996, ch 705.)
The State Education Department recommendation of the Act provides in part: “The bill prohibits HMOs and other managed care entities from preventing providers from advocating on behalf of patients or disclosing to patients appropriate information concerning their care.” (Bill Jacket, L 1996, ch 705.)
The Report on Legislation submitted by the Association of the Bar of the City of New York — Committee on Insurance Law provides: “Providers will be able to advocate on behalf of their patients for approval and coverage of courses of treatment.” (Bill Jacket, L 1996, ch 705.)
If this legislation was truly intended to be comprehensive, then IHA’s limited and narrow interpretation not only renders the legislation unenforceablé, but also runs counter to the broad legislative intent. It is hard to imagine that the Legislature, in passing health coverage protections of this magnitude, intended to allow HMOs to avoid compliance with the patient advocacy provision by simply pointing to other provider deficiencies, whether real or fabricated, significant or insignificant, as a pretense for punishing a provider through termination or nonrenewal for engaging in a protected activity.
The court cannot interpret the statutory language in the fashion suggested by IPA/IHA, since the court must assume that every provision of the statute was enacted to serve some useful purpose, and that an enforceable result was intended. The court will not impute to lawmakers a futile and frivolous intent nor will the court consider the Legislature intended the statutory language to be ineffective or unenforceable. (McKinney’s Cons Laws of NY, Book 1, Statutes § 144; Travelers’ Ins. Co. v Padula Co., 224 NY 397; Matter of Jannicky, 209 NY 413; Matter of Meyer, 209 NY 386.)
*817 As a result, this case calls for an alternative framework on which to review an alleged violation of section 4406-d (5); one that is not so broad as to require a showing that patient advocacy played “no part whatsoever” in a decision not to renew, as Lewis proposes, but one that is not as restrictive as that posited by IPA/IHA. Therefore, this court finds that a violation of section 4406-d (5) will be found upon a showing that patient advocacy was the determining factor in a nonrenewal decision, such that the provider would not have been terminated had s/he not engaged in the protected activity.
If the provider contract was to be renewed absent the patient advocacy, then patient advocacy becomes the “sole” reason for nonrenewal because no other reason, in itself or in combination with other reasons, constituted grounds for nonrenewal. All of the other reasons may have risen to the level of being cause for concern, but, standing without patient advocacy, none would have risen to the level of warranting nonrenewal. This is, in effect, a modified version of the “but/for” standard posited by Lewis. Any other standard, especially that argued by IPA/ IHA, would render the patient advocacy provision useless and unenforceable, a result that could not have been the goal or intent of the Legislature in passing comprehensive HMO reform legislation.
The public policy behind this legislation is analogous to the State’s “Whistle Blower” statute in that both seek to protect and encourage certain advocacy that is beneficial to the public health. Drawing on the State’s employment discrimination case law is appropriate in this case because Public Health Law § 4406-d (5) can be viewed as analogous to an employment discrimination statute.
Due to the paucity of case law on section 4406-d (5) and the “Whistle Blower” statute, this court will draw from the shifting evidentiary burdens used in Human Rights Law (Executive Law § 296) case law as a guide in setting the evidentiary burdens in this case. (See Pace v Ogden Servs. Corp., 257 AD2d 101.)
First, the plaintiff must show that he engaged in the protected activity of patient advocacy and that his contract was not renewed. Lewis’ affidavit alone demonstrates that he engaged in regular and aggressive advocacy for spinal surgery for his patients when they were denied coverage by IHA. Beyond this direct patient advocacy, Lewis lobbied IHA to develop different standards for authorizing or denying spinal surgery and to hire personnel that are more qualified to make such *818 determinations. This effort culminated in a November 29, 1998 letter from Lewis and nine of his colleagues, all IPA providers, outlining their recommendations for a review process that was more sensitive to the needs of the patients. These activities clearly constitute the type of patient advocacy sought to be protected under Public Health Law § 4406-d (5).
At this point, the burden shifts to the defendant to show other valid reasons for the nonrenewal. In this regard, IHA has indicated that there were concerns with Lewis’ performance prior to the nonrenewal. For example, beginning in May of 1998, IHA exercised its contractual right to pass on certain risks to their providers by increasing the amount of their with-. hold, allegedly in response to increased costs associated with Lewis’ provider performance.
Once the defendant has articulated other valid reasons for nonrenewal, the plaintiff must show that the reasons given were simply a pretense for not renewing the contract based on patient advocacy and that the reasons given would not alone or in combination have led to nonrenewal such that patient advocacy became the sole determining factor in the decision not to renew the contract. As evidence of the final stage of the evidentiary framework, the plaintiff can demonstrate that others who are similarly situated and who did not engage in the protected activity were treated differently, i.e., their contracts were renewed. Lewis can point to the allegedly punitive actions of increasing his withhold as potential evidence of a pattern of retaliation for his patient advocacy, but such alleged retaliation cannot in itself constitute a violation of the statute, similar to a hostile work environment, because Public Health Law § 4406-d (5) only addresses the nonrenewal of a contract of employment and not the terms and conditions of employment leading up to such renewal.
The provider performance criteria against which this evidentiary standard is judged will be those called for in Public Health Law § 4406-d (4). IHA is accurate in asserting that the State Legislature did not intend to reach into the daily internal business decisions of HMOs by dictating the details of the broad directive in section 4406-d (4) to develop business standards. Obviously, HMOs are given a great deal of flexibility in establishing internal provider criteria consistent with their business goals. However, some standards are nonetheless required, and, once established, they become the benchmark for provider performance. Given their importance to these evidentiary requirements, the criteria established pursuant to *819 Public Health Law § 4406-d (4) are discoverable, as are any related performance and renewal records of other physician providers, subject to a confidentiality agreement.
Despite IPA/IHA’s repeated insistence that the statute did not intend to invade the daily business decisions of the HMOs, the patient advocacy protections clearly carve out one specific exception to this general laissez-faire rule. Without reliance on the objective criteria for provider performance in Public Health Law § 4406-d (4), the protections contained in the patient advocacy section of the law become virtually unenforceable. Once again, given the magnitude of this legislation, it is doubtful that this was either the goal or the intent of the Legislature in enacting this significant HMO reform law.
As a result, the evidentiary standard set forth above shall dictate the allegations of a violation of Public Health Law § 4406-d (5) and the discovery requested by Lewis shall be granted liberally within the parameters of the CPLR.