James ROE, Hilton Perez, John B. and Jim Moes #1–#3, on behalf of themselves and a class of persons similarly situated, Plaintiffs,

v.

THE CITY OF NEW YORK, New York City Police Commissioner Raymond W. Kelly, and New York City Police Officers Lance Ho, Thomas Hickey, Paul Demorato, and John Does #1–9, Defendants.

No. 00 Civ. 9062(RWS).

United States District Court,
S.D. New York.

Nov. 19, 2002.

As Amended Nov. 21, 2002.

Urban Justice Center, New York, NY, By: Corinne A. Carey, Doug Lasdon, Debevoise & Plimpton, New York, NY, By: Dennis H. Hranitzky, Helen Y. Kim, Swidler, Berlin, Shereff, Friedman, New York, NY, By: Adam J. Wasserman, for Plaintiffs, of counsel.

Honorable Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, By: Lisa J. Black, Assis-

tant Corporation Counsel, for Defendants, of counsel.

## OPINION

SWEET, District Judge.

Plaintiffs James Roe ("Roe"), Hilton Perez ("Perez"), John B., and the putative class of registered participants in authorized needle exchange programs, collectively the "Plaintiffs," have moved for partial summary judgment on Count XII of their Second Amended Class Action Complaint ("SACAC") seeking declaratory relief pursuant to 28 U.S.C. § 2201. Defendants, the City of New York (the "City"), the New York City Police Department Commissioner Raymond W. Kelly ("Commissioner Kelly"), New York Police Department Detectives Lance Ho ("Detective Ho") and Paul A. Demorato ("Detective Demorato") and New York Police Department Officer Thomas Hickey ("Officer Hickey"), collectively the "Defendants," have cross-moved to dismiss pursuant to Rule 56 on grounds of qualified immunity. Fed.R.Civ.P. 56.

For the reasons stated below, the Plaintiffs' motion for declaratory judgement is granted, and the Defendants' motion to dismiss is denied.

### Prior Proceedings

The initial complaint, filed on November 28, 2000, sought damages for Roe arising out of an illegal search, false arrest, malicious prosecution, forced participation in a "buy and bust," conspiracy to violate civil rights, the failure to train police officers, a pattern and practice of violating civil rights, and violation of state rights.

On August 3, 2001, this Court granted Plaintiffs' motions to amend the complaint pursuant to Fed.R.Civ.P. 15(a). *Roe v. City of New York,* 151 F.Supp.2d 495 (S.D.N.Y.2001). The SACAC asserted claims for declaratory and injunctive relief

protecting the Plaintiffs' right to legally possess used hypodermic needles or syringes ("needles" and "syringes" have the same meaning herein) containing a drug residue in the course of participating in a state-authorized needle exchange program. It added Perez and John B. as representatives of the putative class, provided additional facts relating to their claims for injunctive relief, and added Detective Demorato, who arrested Perez, as a defendant.

The SACAC set forth detailed factual allegations pertaining to the link between the use of used needles and the spread of human immunodeficiency virus/acquired immune deficiency virus ("HIV/AIDS") and other blood-borne diseases, the role of needle exchange programs in saving lives by preventing further transmission of disease, and New York City's needle exchange program. The Defendants' cross-motion to strike all references to HIV/AIDS in the SACAC was denied as discussion of HIV/AIDS was deemed central to the case. *Roe,* 151 F.Supp.2d at 510.

The SACAC alleged that the Defendants have a practice of unlawfully harassing, arresting and prosecuting injection drug users such as Plaintiffs, who are registered participants in state-authorized needle exchange programs. They contend that this practice violates their rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and the laws of New York. The Plaintiffs allege further that this practice threatens public health by eviscerating the effectiveness of lawful needle exchange programs, which save lives by reducing the spread of HIV/AIDS and other blood-borne diseases.

Another case involving the arrest of a registered participant in a needle exchange program for the possession of hypodermic needles was accepted as related on April 23, 2001. *L.B. Town of Chester,* 01 Civ. 3204. A motion to dismiss in that case is decided concurrently with the instant action.

Discovery has taken place with respect to Roe and Detective Ho. Discovery has not yet been undertaken with respect to Plaintiffs John B. and Perez.

The instant motions were heard on June 12, 2002, and marked submitted on that date.

### The Facts

As required, the facts are construed in favor of the non-moving party.[1]

### Roe

The parties agree to the following facts. At all relevant times Roe was a participant in the Lower East Side Needle Exchange Program ("LESNEP") and a homeless 21-year old heroin addict and injection drug user who used heroin several times a day.

---

1. Plaintiff submitted a Local Rule 56.1 statement and an amended statement that principally alleges facts regarding the policy of the New York City Police Department (N.Y.PD) with respect to needle exchange programs and Detective Ho's understanding of the intersection of the relevant Penal and Health Laws. While Plaintiffs do object to Defendants' version of the facts surrounding the arrest, they do not, in a Rule 56.1 statement, provide their own version of those events. This, however, does not preclude the Court from gleaning the relevant facts from the other sources which Plaintiff has provided. "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.* 258 F.3d 62, 73 (2d Cir.2001) ("Thus, we have previously indicated, and now hold, that while a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement") (internal citations and quotation marks omitted).

According to the NYPD Tactical Plan, Defendants Detective Ho and Officer Hickey were generally assigned to target areas in the West Village for "buy and bust" operations in the confines of the 6th Precinct. Detective Ho has several years experience on the street with the NYPD narcotics unit, which he has been with since 1992. He has received training in identifying narcotics and other drugs, drug paraphernalia and in dealing with needle exchange program participants. (Def. Amend. Rule 56.1 St. ¶ 21–24.) The parties further agree that on April 19, 1999, during the late afternoon or early evening Roe was in the West Village, in the area around West 10th Street by the Hudson River.

According to Plaintiffs, as provided in the SACAC and in an affidavit of Roe, Roe was walking alone when, without provocation and for no apparent reason, Detective Ho approached Roe, ordered Roe to stand "spread eagle" against a wall and pulled out his badge. (Roe 50–H Test.) Roe complied and at about the same time, approximately five more officers, John Does # 1–# 5, arrived at the scene. Next, frightened by Ho's threat that "you better tell me now [if you have anything sharp on you] because if I get pricked you'll die," Roe revealed that he had a syringe in his pocket. Roe also identified himself as an authorized participant in the LESNEP and explained that Detective Ho could confirm that fact by examining his membership card, which was in Roe's pocket. Even though Detective Ho had been trained to inquire into the matter further before arresting Roe for syringe possession, he ignored the card. Instead, Detective Ho criticized needle exchange programs and mocked the government officials responsible for their creation. (Pl. Counter St. Local Rule 56.1 ¶ 6.) The syringe was removed from Roe's right-hand pants pocket. (*Id.* at ¶ 3.) Three bottle caps removed from Roe were found inside a Ziploc bag in his pocket. (*Id.* at ¶ 4). Roe further submits that injecting heroin requires the use of alcohol swabs, cotton balls, water, a tourniquet, and a flame to melt the heroin, and that Detective Ho did not recover this equipment.

According to Roe, Detective Ho did not look to see if there was drug residue in either the syringe or the bottle caps, conducted no field tests to confirm the presence of drug residue in either, found no plastic bags or glassine envelopes (the packaging typically used for heroin). Nonetheless, Detective Ho placed Roe under arrest for unlawful possession of heroin based on what Ho assumed was residue in the needle. And even though Roe had identified himself as a needle exchange program participant and explained to Detective Ho where he could find his participant card, he also arrested Roe for unlawful possession of a hypodermic instrument.

According to both parties, Roe was then taken to the 6th Precinct. According to Roe, he was placed in a holding cell and a while later an officer, believed to be Officer Hickey, went back to the holding area to inform Roe that he was being arrested for possession of drug paraphernalia. Roe alleges that Officer Hickey mutilated Roe's needle exchange card by clipping it in half. (Roe 50–H Test. at 13.)

Roe claims that he complained until a supervising officer (John Doe # 6) arrived. Because on other occasions Roe has known New York City police officers to destroy or discard the registration cards of other needle exchange participants, he carried an extra copy of the participant card in his sock. He informed the officer who he believed was a supervising officer that he was authorized to possess hypodermic syringes. This supervisor said he had to talk to the arresting officer, left Roe, and did

not return. (SACAC ¶ 90.) Since his arrest, Roe no longer feels safe returning used needles to the LESNEP.

According to Defendants, the officers observed Roe in the West Village in a known drug area. Roe was crouching or squatting in a corner, holding what appeared to be a hypodermic needle to his arm, injecting himself. Officer Hickey and Detective Ho got out of their vehicle and stopped Roe and recovered the hypodermic syringe as well as three metal bottle caps. They observed residue in the hypodermic instrument and on the caps that they believed to be an illegal narcotic (likely heroin). Roe also informed Detective Ho that he was on the corner for the purpose of prostituting himself at a known prostitute location. The officers did not obtain any identification or information from Roe that would have identified Roe as a member of LESNEP or any other needle exchange program. Detective Ho and Officer Hickey arrested Roe on West 10th Street at about 6:30 p.m. and charged him with possession of a controlled substance under N.Y. Penal Law Section 220.03 (McKinney 2000) and possession of a hypodermic instrument under Penal Law Section 220.45 (McKinney 2000). (Def. Local Rule 56.1 Amend. St. ¶ 27–34.)

According to Plaintiffs, the controlled substance charge was based on the residue that Officer Ho believed remained in Roe's used hypodermic needle. Finally, according to Plaintiffs, Detective Ho and other defendants ordered Roe to assist them in a sting operation, threatening to send Roe to Rikers Island if he did not. (Pl. Local Rule 56 Count. St. § 7.) Roe was released sometime before dawn on April 20, 1999. On or about June 2, 1999, the New York County District Attorney's Office declined to prosecute Roe for the charges.

Plaintiffs further allege that the Defendants interpret the regulations authorizing needle exchange programs as providing no defense to criminal liability under the Penal Law for possession of the drug residue typically contained in a used needle or syringe. Detective Ho's deposition and the statement on behalf of the Defendants at oral argument support this allegation.

> The Court: Therefore it's the City's view that they can arrest anybody with a dirty needle, period?
>
> Ms. Black: Under the law the way its written right now, yes. That's not the facts of this case, no.

(Tr. p. 23 lines 14–19 (June 12, 2002)).

### *Perez*

Perez is a 32–year old New York City resident and an injection drug user. Perez has been injecting heroin since 1998 and has been a member of a New York City needle exchange program called the Foundation for Research on Sexually Transmitted Diseases ("FROSTD") since 1998. In the early afternoon on December 29, 2000, Perez left his building to go out with his girlfriend (whose name is not provided in the record). They walked a few blocks to Sheepshead Bay Road and East 14th, when undercover NYPD officers stopped them. The officers asked Perez where he and his girlfriend were coming from and what they had in their pockets, and Perez responded that they were coming from his apartment. After further interrogation, Perez he told the officers that he had one new syringe, still in its original wrapper, in the bag he was carrying. He informed the officers that he was a member of a needle exchange program and had his participant identification card. Upon further questioning, Perez's girlfriend told the officers that she had a bottle of methadone in her pocket. As an officer searched Perez and removed his wallet, Perez told the officer that his needle exchange card was inside the wallet. The officer responded "I don't

want to hear it." After they had been searched, both Perez and his girlfriend were placed under arrest by Detective Demorato. Perez was charged with possession of a controlled substance, which he believes was based on residue supposedly found in his syringe, even though the syringe was new and in its original package. Perez pled not guilty to the charge and was released on his own recognizance. (SACAC at ¶ 109–131.) The final disposition of the charge is not noted in the record.[2]

### John B.

John B. is a 33 year-old New York City resident who is HIV positive and suffers from a diagnosis of full-blown AIDS. He has been using drugs since he was twelve years old and heroin since 1996, which he uses to relieve pain from a parasitic infection. John B. joined the LESNEP around the Spring of 1997 because he knew it was important to use clean syringes and not share them with other people. When he joined the needle exchange program he was given a participation card that he was told to show to police if stopped. John B. has many friends and acquaintances who are needle exchange program participants who have been stopped and arrested by the police and had their participation cards destroyed. He has heard of such incidents from at least 25 injection drug users.

John B. feels nervous entering or walking out of the needle exchange program for fear of being arrested for possession of a needle or the drug residue it contains. On many occasions, rather than obtain clean syringes, he would wash and re-use them. His arms were often scarred and bruised from using the dull tips of used syringes.

It is established, as common sense would dictate, that used needles and syringes virtually always contain some drug residue, and this has not been rebutted. (*See* Grove Aff. ¶¶ 11, 13.)[3] Plaintiffs have submitted publications from medical

2. Although this Court would usually look for a favorable outcome from the proceedings, such as a dismissal, this is not a requirement in the context of a false arrest claim. *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) ("A favorable termination of the proceedings is not an element of [the false arrest] tort"); *Weyant v. Okst,* 101 F.3d 845, 853 (2d Cir.1996) (*Singer* "makes clear that in order to pursue a claim for false arrest [plaintiff] was not required to show that the Town Court criminal proceeding ended in an adjudication that he was not guilty of the charges against him").

3. Plaintiffs provide the affidavit of Donald Grove, Technical Resources Coordinator at the Harm Reduction Coalition, a non-profit national education and advocacy organization focused on reducing drug-related harm through harm reduction techniques such as needle exchange. Grove helped found LESNEP in 1990 and claims considerable knowledge concerning the use of injection equipment by intravenous drug users. Grove states that a needle exchange program "encourages trading-in used injection equipment to ensure that injection equipment is removed from circulation and disposed of correctly to eliminate their risk to public health." (Grove Aff. at ¶ 10.) Grove explains that the risk of HIV is extreme for injection drug users because they inject drugs directly into a vein. "In order to confirm that the needle is in a vein, an injection drug user must pull back the plunger and draw venous blood into the barrel of the syringe" and "when blood is drawn into the syringe, it mixes with the drugs." Grove further affirms that when a syringe "is used to inject drugs, it invariably contains some residue from the drug that was injected, and the residue of the blood and drug mixture becomes trapped in the syringe." (Grove Aff. ¶ 11.) The risk to public health arises when intravenous drug users do not dispose of the needle but rather allow it to be used by another individual. Grove Aff. ¶ 12. The Defendants contest these facts but offer no facts in rebuttal. They agree, however, that both the cap which is used to heat heroin and the syringe often bear traces of heroin residue right after use. (Def. Local Rule 56.1 Amend. St. ¶ 20.)

journals, needle exchange programs, and other sources, all unrebutted, that address the effect that the criminal justice prohibitions have upon the behavior of drug users. *See generally, HIV Prevention with Drug–Using Populations–Current Status and Future Prospects in* 113 Public Health Reports, 4, June, 1998, Ex. A SACAC at 75 ("Despite high levels of knowledge about risk, multiperson use of needles and syringes is due primarily to fear of arrest and incarceration for violation of drug paraphernalia laws and ordinances that prohibit manufacture, sale, distribution, or possession of equipment and materials intended to be used with narcotics"); *Collateral Damage in the War on Drugs: HIV Risk Behaviors Among Injection Drug Users in* International Journal of Drug Policy, 1999, Ex. I SACAC ("Qualitative studies have consistently reported that IDU's [intravenous drug users] are reluctant to carry their own syringes due to fear of arrest for fear of violating state law against possession of syringes"); American Bar Assoc. Criminal Justice Section, *Report,* Ex. B SACAC at 5 (Intravenous drug users "are compelled to use dirty syringes because of the scarcity and higher prices of unused needles, and the fear of arrest for possession of syringes and needles").

### The Pending Motions and Issues Presented

Plaintiffs have moved for declaratory judgment seeking a determination that in the course of participating in a needle exchange program, as envisioned under the authorizing regulations, needle exchange participants are exempt from criminal liability for possession of the drug residue contained in used needles and syringes. (SACAC ¶ 231.)[4] Plaintiffs contend that it could not have been the intent of the Legislature to make needle exchange partially illegal by making the return and receipt of used needles and syringes, the heart of HIV-prevention, subject to criminal prosecution.

Defendants oppose declaratory judgment and have cross-moved for summary judgment to dismiss the SACAC based upon the doctrine of abstention and qualified immunity for the individual defendants.

### The Statutes and Regulation at Issue

Needle exchange in New York is governed by interrelated provisions of the New York Penal Law, the New York Public Health Law, and the New York Code of Rules and Regulations.

New York Penal Law § 220.45 makes it a misdemeanor to knowingly and unlawfully possess or sell a hypodermic needle or syringe and § 220.03 makes it a misdemeanor to knowingly and unlawfully possess a controlled substance.[5] N.Y. Penal Law § 220.45, § 220.03. The definitions for these sections, provided in § 220.00, defines "unlawfully" as a violation of Article 33 of the Public Health Law. N.Y. Penal Law § 220.00. Thus the unlawfulness of possession of needles and narcotics is to be determined with reference to Health Law, not the Penal Law alone.

---

**4.** Although the SACAC requests declaratory relief such that needle exchange participants are exempt from criminal liability for possession of drug residue "contained in used *injection equipment*" (emphasis added), Plaintiffs have clarified that they seek such relief with respect to hypodermic needles or syringes only. (Tr. at p. 27 Lines 24–25, p. 28 Line 1 (June 12, 2002.)).

**5.** The criminalization of "drug paraphernalia" can result in apparently innocent objects being the grounds for arrest and prosecution. *U.S. v. Schneiderman,* 777 F.Supp. 258 (S.D.N.Y.1991) (finding criminal drug paraphernalia law unconstitutionally vague as it contained strict liability standard); *rev'd* 968 F.2d 1564 (2d Cir.1992).

The Public Health Commissioner (the "Commissioner") is delegated broad powers to promulgate all rules or regulations necessary to effectuate the purposes of Article 33 of the Public Health Law. Section 3308(2) provides in relevant part:

> The commissioner is hereby authorized and empowered to make any rules, regulations and determinations which in his judgment may be necessary or proper to supplement the provisions of this article to effectuate the purposes and intent thereof or to clarify its provisions so as to provide the procedure or details to secure effective and proper enforcement of its provisions.

N.Y. Pub. Health Law § 3308(2) (McKinney 2002).

The legislative purpose of Article 33 is to combat the illegal "use of and trade in controlled substances" and to allow the "legitimate use of controlled substances in health care ... research and other uses authorized by this article or other law; under appropriate regulation ..." N.Y. Pub. Health Law 3300–a (McKinney 2002).

Specifically addressing the issue of the possession of needles and syringes, the Legislature has made it unlawful to possess a syringe unless by prescription, by authorization from the Commissioner, or under certain other conditions. N.Y. Pub. Health Law § 3381(1) and (2) (McKinney 2002). Section 3381(4) authorizes the Commissioner to designate persons or classes of persons who may obtain syringes and needles without a prescription. Section 3381 5(a) provides that the Com-

missioner, in consultation with certain other agencies, shall develop a number of "pilot projects to test the practicality and effectiveness of the distribution of syringes ... for single use and which are non-reusable." N.Y. Pub. Health Law § 3381(5)(a). Section 3381(6) effective January, 2001, and set to expire in March, 2003, permits the purchase of needles and syringes from pharmacies without a prescription where, *inter alia*, information regarding HIV transmission is provided at the point of sale. N.Y. Pub. Health Law § 3381(6).

Based on the authority derived from § 3308 and § 3381(1) and (4) of the Public Health Law, since 1992 the Commissioner has promulgated regulations creating needle exchange programs whereby intravenous drug users return used needles in exchange for clean ones, thereby removing dirty needles contaminated with HIV and other diseases from circulation. In passing the regulations the Commissioner noted that the programs reduce the risk for HIV infection and serve as access points for drug treatment, health and social services, and that research has shown that they do not increase the rate of injection drug use. NYS Register, October 13, 1993 at 22, 25. The regulation that governs needle exchange programs in New York is N.Y. Comp.Codes R. & Regs. tit. 10 § 80.135 ("10 N.Y.C.R.R. § 80.135").[6] The parties agree that the Commissioner has acted within the scope of his expert authority in creating needle exchange programs and has not raised the separation of

---

**6.** N.Y. Pub. Health Law Section 3308(4) provides that the regulations shall have the force of law ("[t]he rules, regulations and determinations, when made and promulgated by the commissioner, shall be the rules, regulations and determinations of the department and, until modified or rescinded, shall have the force and effect of law. It shall be the duty of the department, to enforce all of the provisions of this article and all of the rules, regulations and determinations made thereunder"). The parties agree that the Commissioner has acted within the scope of his expert authority in creating needle exchange programs and has not raised the separation of powers concerns addressed in *Boreali v. Axelrod*, 71 N.Y.2d 1, 523 N.Y.S.2d 464, 517 N.E.2d 1350 (1987).

powers concerns addressed in *Boreali v. Axelrod*, 71 N.Y.2d 1, 523 N.Y.S.2d 464, 517 N.E.2d 1350 (1987).

10 N.Y.C.R.R. § 80.135 provides that authorized nonprofit organizations and government entities, in order to reduce the transmission of HIV, may obtain, possess and furnish to registered drug users clean needles in exchange for used ones. The receipt of used needles is central to the Commissioner's efforts to remove dirty needles from circulation and reduce the transmission of HIV. Section 80.135 contains eleven separate provisions that require, govern or otherwise contemplate the return, collection or disposal of used injection equipment. 10 N.Y.C.R.R. § 80.135(a), (c), (e)(1), (g)(9), (g)(10), (h)(3), (h)(4), (i), (j)(4), (m)(9), (m)(10).

As contemplated by regulation, needle exchange programs have issued participation cards to registered participants. 10 N.Y.C.R.R. § 80.135(m)(9). The cards contain a unique identification code, cite the relevant statutory authorities and request that officers, if in doubt regarding an individual's status, call the needle exchange program and the Department of Public Health.

The NYPD has promulgated Operations Orders recognizing the needle exchange program identification cards and directing officers in how to interact with authorized participants. (N.Y.PD Operations Order 70, issued July 8, 1994 was replaced by NYPD Operations Order 23, issued March 28, 2000) (there are minor modifications in the more recent Order but both agree on the points discussed herein). The Orders instruct officers that an individual in pos-

session of syringes or needles and a participation card should not be arrested if the only charge is criminal possession of a hypodermic instrument. Even where arrest is affected on another charge, authorized participants should not be charged with criminal possession of a hypodermic instrument.[7] The Orders further provide that where verification of the individual's participation or the status of the needle exchange program is needed, that the officer should telephone the relevant numbers provided on the participation card and on the Operations Order. The Operations Orders do not provide specific directions to officers confronted with used needles containing a drug residue, although they do instruct officers in handling used syringes so as to avoid infection.

### Abstention is Not Appropriate

■ According to Defendants, the Court should abstain based on the *Pullman* doctrine as there are disputed issues of state law that are prior to the constitutional issues. Defendants urge that if their reading of the state law is adopted, then the constitutional issues need not be reached as there was probable cause to effect the search and arrest of Roe and there is thus no violation of constitutional rights.

■ The purpose of *Pullman* abstention is to "further[ ] the harmonious relation between state and federal authority" where there are unsettled questions of state law that are antecedent to federal constitutional questions. *Railroad Comm'n v. Pullman*, 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941). At the same time, the Supreme Court has rejected the inference that any challenge to an

---

7. *See, for e.g.,* Operations Order 70 ¶ 4 ("If a uniformed member of the service encounters a program participant in possession of needles/syringes and an identification card from an authorized needle exchange program, an arrest should *not* be effected if the only charge is criminal possession of a hypodermic instrument. Authorized participants should not be charged with criminal possession of a hypodermic instrument, even in circumstances where an arrest is effected on another charge"). (SACAC Ex. H).

unclear state statute should be left to state courts to make a limiting construction. *Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (*Pullman* abstention "is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law" but rather is "made on a case-by-case basis").

 The Second Circuit has identified factors that should be considered in the discretionary decision to abstain: "(1) an unclear state statute or uncertain state law issue; (2) determination of the federal issue turns upon resolution of the unclear state law provision; and (3) the state law provision is susceptible to an interpretation that would avoid or modify the federal constitutional question presented." *Planned Parenthood of Dutchess–Ulster, Inc. v. Steinhaus,* 60 F.3d 122, 126 (2d Cir.1995). While the issue in the instant case has not been considered by the New York state courts, that does not, without more, make the law unclear or uncertain. *Id.,* at 126. ("The regulations at issue are neither ambiguous not unintelligible, nor are they rendered 'unclear' merely because no state court has yet construed them"). The statutes and regulation are straightforward and mandate one reading. Thus the first prong of *Planned Parenthood* is not met.

██ Even where the three criteria are met courts are to consider the fact that the "possible constitutional rights are, by hypothesis, at risk." *Tunick v. Safir,* 209 F.3d 67, 78 (2d Cir.2000). It is thus appropriate to consider the effect of the delay caused by certification and abstention. *Id.,* at 78 (*citing Harman v. Forssenius,* 380 U.S. 528, 537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (finding that the district court did not abuse its discretion in declining to abstain in a federal voting rights suit challenging Virginia's limitations on the franchise "[g]iven the importance and immediacy of the problem, and the delay inherent in referring questions of state law to state tribunals"); *Bad Frog Brewery, Inc. v. New York State Liquor Auth.,* 134 F.3d 87, 94 (2d Cir.1998) (declining to abstain in a suit raising a First Amendment challenge to New York's regulation of liquor advertising and labeling in part because "[a]bstention would risk substantial delay while [the plaintiff] litigated its state law issues in the state courts"); *Public Service Co. v. Patch,* 167 F.3d 15, 24 (1st Cir.1998) (declining to abstain where the timing of proceedings in state court was uncertain and plaintiff faced an immediate threat to asserted rights)). "Rights delayed, after all, are often rights destroyed. And it is therefore not surprising that *Pullman* abstention has been used only very sparingly." *Tunick,* 209 F.3d at 78. Because there is not the option of certifying to the New York Court of Appeals,[8] and there is no related case pending in the state courts, the delay that may result is a further factor weighing against abstention.

### Declaratory Judgment Is Appropriate

██ The requirements for declaratory judgment are set forth in 28 U.S.C. Section 2201(a): "In a case of actual controversy within its jurisdiction ... any court in the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether no relief is or could be sought." 28 U.S.C. Section 2201(a) (West 1994). Issuance of a declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy

---

8. New York does not permit certification from a district court. 22 N.Y.C.R.R. § 500.17(a).

giving rise to a proceeding. *Continental Cas. Co. v. Coastal Savings Bank*, 977 F.2d 734, 737 (2d Cir.1992) (internal citation omitted).

■ "In determining a motion for summary judgment that is filed in the context of a declaratory judgment action, the same standard is applied as in any other action." *United States v. State of New York*, 3 F.Supp.2d 298, 307 (E.D.N.Y.1998). Rule 56(c) provides that a motion for summary judgment may be granted when "there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All ambiguities must be resolved, and all inferences drawn, in favor of the nonmoving party.

■ There is an apparent conflict between the Penal Law and the Public Health Law that warrants declaratory judgment. In their motion papers, parties agree that the New York Court of Appeals in *People v. Mizell*, 72 N.Y.2d 651, 655, 536 N.Y.S.2d 21, 532 N.E.2d 1249 (1988) held that possession of trace amounts of a controlled substance violates New York Penal Law, and that nowhere in New York law is there an express provision exempting needle exchange programs or their participants from the resulting criminal liability. Common-sense and this record establish that used needles will contain some residue, a trace, of the substance injected. *See* Grove Aff. ¶¶ 11, 13.[9] Since needle exchange participants and staff must at some time possess dirty needles, they are apparently expected to violate the Penal Law. There is therefore an apparent conflict between the penal and health regimes.

Declaratory judgment is thus appropriate under the criteria discussed in *Continental Cas.* 977 F.2d at 737.

### Probable Cause For Arrest does Not Affect Standing to Request Declaratory Relief

■ Defendants also object to Plaintiffs' standing to request declaratory judgment, contending that there is a genuine issue of material fact whether there was probable cause for the arrest of Roe in which case Roe's claims for false arrest and malicious prosecution must fail.

■ Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir.1998); *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir.1987). Under Defendants' version of the facts, Detective Ho and Officer Hickey observed Roe injecting himself with a hypodermic instrument.

Notwithstanding this contention, which refers only to Roe and not the other Plaintiffs, Plaintiffs have standing to pursue their declaratory judgment claim because an actual controversy exists between the parties as to the proper interpretation of the laws governing needle exchange, and because Plaintiffs are likely to suffer future harm as a result of Defendants' interpretation of Section 80.135. As this Court determined, Plaintiffs have satisfied the burden of pleading likelihood of future harm in this case. *See Roe v. City of New York*, 151 F.Supp.2d 495, 502–504

---

9. No facts have been presented by the Defendants to the contrary. ("[T]he syringe often bare[s] traces of heroin residue right after use." Def. Local Rule 56.1 Amend. St. ¶ 20).

(S.D.N.Y.2001) (no per se rule requiring any prior act as basis for finding future likelihood of future injury where ongoing pattern and practice of arresting and detaining needle exchange participants in the vicinity of needle exchange participants in the vicinity of needle exchange centers pled); *see also Deshawn v. Safir*, 156 F.3d 340, 344 (2d Cir.1998) (likelihood of future harm requirement applies to claim for either injunctive or declaratory relief).

Defendants also contend that declaratory judgment should be denied on the grounds that the Plaintiffs have not established a pattern and practice of arresting and prosecuting needle exchange participants based on the trace amount of drugs left in their needles and syringes. The facts found above are to the contrary. The Plaintiffs have provided unrebutted evidence in the testimony of Officer Ho. In addition, the claims of Perez and John B. and the proposed class as a whole, the absence of any instructions in the Operating Order regarding dirty needles, and the position of Corporation Counsel that possession of contaminated needles is a criminal offense, constitute sufficient evidence of a controversy for the purposes of a declaratory judgement.[10]

As Defendants made clear during oral argument: "plaintiff's allegations, even if true that he was a member of the needle exchange program, does not exempt him for the arrest of the residue in the needle ..." (Tr. at 21 Lines 5–8 (June 12, 2002)). There is therefore an actual controversy over the rights of the Plaintiff class warranting declaratory relief.

### Under New York Principles of Statutory Construction The Statutes are Reconcilable

 Under the facts, as found above, the parties differ as to the interrelation of the relevant state regulations, the Penal Law and the Public Health Law. According to the Plaintiffs, the statutes bar the arrest of a participant for the possession of a hypodermic syringe containing a trace of a controlled substance in the course of participating in a needle exchange program. To arrest under such circumstances violates the Fourth, Fifth and Fourteenth Amendments the United States Constitution.[11] The City maintains there is no exemption from arrest and prosecution and that the Public Health Law and regulations provide only a defense. The question is thus presented as to whether the statutes can be reconciled under accepted principles of statutory construction in a manner to avoid the constitutional issues.

In interpreting state statutes, the Second Circuit has directed that federal courts "will consider not only state statutes but also state decisional law" and that in "making this determination, we afford the greatest weight to decisions of the New York Court of Appeals." *Elliott Associates, L.P v. Banco de la Nacion*, 194

---

10. The issue of *Monell* liability is not presently before the Court. However, on question of finding *Monell* liability on evidence presented *see generally, Lauro v. City of New York*, 39 F.Supp.2d 351, 367 (S.D.N.Y.1999) (where detective's testimony as to police procedure condoning the use of "perp walks" was sufficient for the court to find on summary judgment the existence of a departmental policy); *rev'd on other grounds* 219 F.3d 202, 206 n. 4 (2d Cir.2000).

11. While the Fifth Amendment claim is not discussed in this opinion, it is based on the contention that in order to gain the benefit of the needle exchange program, the participant must incriminate himself by announcing that he likely is violating the drug possession laws, and is therefore improper.

F.3d 363, 370 (2d Cir.1999) (internal citations and quotation marks omitted).

 The fundamental principle of construction under New York law is to give effect to the intention of the legislature. The intention is first to be sought from a literal reading of the act itself or of all the statutes relating to the same general subject matter. *Patrolmen's Benevolent Assn. v. City of New York*, 41 N.Y.2d 205, 208, 391 N.Y.S.2d 544, 359 N.E.2d 1338 (1976) ("It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature, and where the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used") (internal citations omitted). "If the words employed by the legislature have a definite meaning, which involves no absurdity or contradiction, then there is no room for construction and courts have no right to add to or take away from that meaning." *Wilt v. Brunswick Plaza L.L.C.*, 183 Misc.2d 452, 703 N.Y.S.2d 700, 702 (2000) (citations omitted) ("Sound principles of statutory interpretation generally require examination of a statute's legislative history and context to determine its meaning and scope"). *See Patrolmen's Benev. Ass'n v. New York State*, 188 Misc.2d 146, 728 N.Y.S.2d 875, 881 (2001) ("Furthermore, a construction that would produce an 'absurdity' is to be rejected") (citation omitted); *In re Schacht*, 20 A.D.2d 507, 248 N.Y.S.2d 65, 69 (1964) (court should beware interpretation that would "result in perversion of the legislative intent"). "Generally, the same canons of construction are applicable to legislation and administrative regulations ..." *Garzilli v. Mills*, 250 A.D.2d 131, 681 N.Y.S.2d 176, 179 (1998).

 Courts, in determining intent, should also consider "the mischief sought to be remedied by the statutory enactment and the court should construe the language in question so as to suppress the evil and advance the remedy." *Lewis v. Individual Practice Ass'n*, 187 Misc.2d 812, 723 N.Y.S.2d 845, 848–49 (2001).

 Where Legislative enactments appear to conflict it is the court's role to harmonize and reconcile them, "[i]t is not the function of the court ... to declare one statute the victor over another if the statutes may be read together, without misdirecting the one, or breaking the spirit of the other." *Foley v. Bratton*, 92 N.Y.2d 781, 787, 686 N.Y.S.2d 359, 709 N.E.2d 100 (1999); *In re Goodman*, 95 N.Y.2d 15, 21–22, 709 N.Y.S.2d 884, 731 N.E.2d 600 (2000) (where Court of Appeals confronted two sections of Labor Law that were in conflict the court noted that "nothing in the statutes themselves, the unemployment insurance legislative scheme, or the legislative history of these statutes suggests that one is to have primacy over the other" and that even though the "tension between the two statutes may benefit from legislative refinement ... nothing prevents ... [them] from operating together").[12] "An agency's interpretation of the statutes it administers generally should be upheld if not unreasonable or irrational," *Rodriguez v. Perales*, 86 N.Y.2d 361, 633 N.Y.S.2d 252, 657 N.E.2d 247, 250 (1995).

---

**12.** Defendants argue that the rules of statutory construction in New York provide that where the Legislature has not acted or has declined to act, the courts may not "circumvent the legislative process by resorting to administrative rule-making or judicial legislating." (Def. Br. at 12–13.) Defendant cites *Jewish Home and Infirmary of Rochester v. Commissioner of New York State Dep't of Pub. Health*, 84 N.Y.2d 252, 263, 616 N.Y.S.2d 458, 640 N.E.2d 125 (1994) in support of this position. However, *Jewish Home* concerned the construction of one law, not an apparent conflict between two or more enactments.

Two other principles of construction under New York law are also relevant. The first requires that "in construing law and regulations governing public health ... such legislation should be liberally construed." *People v. Eisen,* 77 Misc.2d 1044, 353 N.Y.S.2d 886, 888–89 (1974), *aff'd* 79 Misc.2d 829, 362 N.Y.S.2d 340; *see also, People v. Frudenberg,* 209 N.Y. 218, 103 N.E. 166, 167 (1913), *Putnam Lake Community Council Bathing Beaches v. Deputy Com'r of Health of the State of New York,* 90 A.D.2d 850, 456 N.Y.S.2d 100, 101 (1982). Conversely, "criminal statutes must be strictly construed," *People v. Ryan,* 274 N.Y. 149, 8 N.E.2d 313, 316 (1937), and an exemption to a criminal statute should be construed liberally. *People ex rel. Reibman v. Warden,* 242 A.D. 282, 275 N.Y.S. 59, 62 (1934) ("liberality of construction belongs to all acts of amnesty and grace"). *People v. Dennis,* 206 Misc. 402, 133 N.Y.S.2d 586 (1954) (penal statutes are construed strictly, where statutes promoting public good receive liberal construction).

Here these principles must be applied to determine the legality of the possession of a used needle or syringe with a residue or trace amount of a controlled substance in the context of a state-authorized needle exchange program. Consideration must be given to the intent of the Legislature in granting the Commissioner power to authorize the possession of hypodermics and create pilot programs for the return of used needles, the intent of the Commissioner in creating needle exchange programs, and the intent of the Legislature in criminalizing the possession of certain narcotics. Neither Public Health Law § 3381, authorizing the Commissioner to designate persons allowed possess needles and syringes, and Section 80.135, implementing needle exchange programs, directly address the effect that Penal Law § 220.03 is to have on needle exchange programs or the participants. Nor has this question been addressed by the state courts. The fundamental principles of construction, as discussed above, in a context where there is potential conflict between the laws is to reconcile them so as to give effect, as best as possible, to the intent of the Legislature.

In *Mizell* the New York Court of Appeals found that Penal Law § 220.03 applies even to unusable quantities of drug residue because that application would serve the statute's purpose of reducing illegal drug use. Specifically, the Court reviewed the Legislative intent and found that the,

> Legislature sought also to deter the traffic in narcotics that has so devastated human life and the fabric of society. As noted in the 1972 Interim Report of the Temporary State Commission to Evaluate the Drug Laws, which the Legislature drew upon in formulating article 220 ... "Our determination to retain the concept of misdemeanor possessory offenses is based upon our belief that the removal of the potential penal consequences will effect an increase in the incidence of drug abuse * * * We do not choose to run the risk of increasing the incidence of drug abuse by the removal of penal sanctions for the unlawful possession of dangerous drugs." (1972 N.Y. Legis. Doc. No. 10, at 58; *see also, People v. Broadie,* 37 N.Y.2d 100, 113, 371 N.Y.S.2d 471, 332 N.E.2d 338, *cert denied* 423 U.S. 950, 96 S.Ct. 372, 46 L.Ed.2d 287.)"

*Mizell,* 536 N.Y.S.2d 21, 532 N.E.2d at 1251–52. Thus, according to the Court of Appeals, the intent of the Legislature was, in part, to deter the traffic in narcotics and

256

arrest any increase in drug abuse.[13]

Through the late 1980's and the early 1990's, as the AIDS crisis took on staggering proportions, the Commissioner, pursuant to authorization by the Legislature, has developed a second approach to dealing with drug abuse according to which drug users are encouraged to avoid some of the deadly and disease-spreading aspects of intravenous drug use.[14] The Commissioner described the health crisis in 1993 in the following way:

Injection drug use has become the greatest risk factor for HIV transmission in New York State, and therefore presents the greatest opportunity for controlling the spread of the disease in New York State. New York State has 38 percent of the nation's drug-related AIDS cases, more than any other state ... Forty-four per cent of adult AIDS cases statewide are among injection drug users (IDUs); the national rate is 29 percent ...

Eighty-one percent of heterosexually transmitted cases involve transmission of HIV from male IDU to a non-injecting female partner ... Seventy percent of New York's pediatric AIDS cases are among children whose mother was an IDU or the partner of one ...

Although an estimated 260,000 IDU's live in New York State (some 200,000 in New York City), only 50,000 treatment slots exist ...

[O]ther HIV-prevention, harm reduction strategies must be pursued. These measures include the availability of clean injecting equipment for those addicts who will not or cannot stop injecting. Studies conducted in the United States and abroad have shown that needle exchange programs, as part of a comprehensive AIDS prevention strategy, can help IDU's to significantly reduce HIV risk behaviors. The research has also shown that the programs do not increase the rate of injection drug use. Needle exchange programs have demonstrated an ability to bring hard-to-reach IDU's into health and social services and can act as a bridge to drug treatment. In addition, the programs can reduce the risk of public exposure to HIV by reducing the number of needles that are disposed of in public places.

N.Y.S. Register, *Notice of Adoption,* October 13, 1993, at 25.

The most recent act of the Legislature in this area of public policy, as discussed above, permits the purchase of needles without prescription from pharmacies. Included in the legislative history of that Public Health Law section 3381(b) is a report from the New York State Bar Association's Special Committee on AIDS and the Law which noted that research proves that providing access to sterile syringes does not cause drug abuse to increase and

13. The Court of Appeals also expressed concern that reading the Penal Law to require a "usable amount," "would add uncertainty to the law." *Mizell* 536 N.Y.S.2d 21, 532 N.E.2d at 1252. A usable amount standard, the court feared, would require individualized determinations of what amount was in fact usable. Here, however, a usable amount exception is not suggested and thus this concern is not raised. Here it is the residue that is necessarily left due the mechanical operation of a needle, not a quantity relating to the individual drug user.

14. "HIV was introduced into the injection drug user population in New York City during the mid–1970's; the virus spread rapidly among injection drug users during the late 1970's and early 1980's, and HIV seroprevalance reached approximately 50%." *HIV Incidence Among Injection Drug Users in New York City, 1992–1997: Evidence of a Declining Epidemic.* (SACAC Ex. G.).

that it is believed that needle exchange programs have helped some drug users to enter treatment programs. *Legislation Report No. 59*, Special . Committee on AIDS and the Law, N.Y. State Bar Ass'n (June 14, 1999), *in* N.Y. Legis. Serv. Bill Jacket, ch. 56 (2000).

While the main goal of the health regime is to reduce the spread of HIV/AIDs, it shares with the regime the goal of drug-use reduction. *Mizell* sought simply to eliminate any issue as to the amount of a controlled substance in dealing with drug related offenses. The issue presented here was not before the Court of Appeals.

The Legislature's intent is made clear by its determination that the criminality of drug and needle possession is to be determined in accordance with the Public Health Law and thereby the regulations promulgated by the Commissioner. *See* N.Y. Penal Law ¶ 220.00. Here there is no question raised by either party that the Commissioner has acted beyond the scope of his power in creating a needle exchange program that allows, requires, and expects participants to possess and return used needles. As established, those used needles will typically contain a drug residue. The very name, needle exchange, reveals the centrality of returning used needles and syringes to the program. It would be bizarre to conclude that the Legislative intent was to permit the creation of needle exchange programs in order to remove dirty needles, while at the same time frustrating that goal by making the essential steps of participation criminal.

Defendants contend that participation in a needle exchange program is a defense to prosecution under Penal Law § 220.45 for the possession of a needle or syringe, not an immunity from arrest.[15] Since unlawful possession of a hypodermic needle is defined by reference to the Public Health Law and thereby the regulations authorizing registered participants, there is no underlying crime. Logically and as a matter of law there can be no probable cause. It is also noted that Defendants' position is not supported by the relevant Operations Order of the NYPD or by the Deputy Commissioner for Legal Matters. They have taken the position that needle exchange participants are not to be arrested or charged under § 220.45.[16] Given the aim

---

**15.** Defendants rely on N.Y. Public Health Law § 3396(1) for their interpretation. It provides that "in any civil, criminal or administrative action or proceeding brought for the enforcement of any provision of this article, it shall not be necessary to negate or disprove any exception, excuse, proviso, or exemption contained in this article, and the burden of proof of any such exemption, excuse, proviso, or exemption shall be upon the person claiming its benefit." However, § 3396(1) concerns enforcement under the Public Health Law, and thus is inapplicable to the analysis of enforcement under the Penal Law. While the definition of "unlawful" in the Penal Code is provided by cross-reference to the Public Health Law, that does not change an arrest under the Penal Code into a action or proceeding for the enforcement of the Public Health Law, as § 3396(1) clearly requires. In *People v. Strong*, 47 A.D.2d 798, 365 N.Y.S.2d 310, 312 (1975) the Supreme Court found that § 3393 of the Public Health Law (providing the same burden as present-day § 3396(1)) applied to a prosecution for possession of syringe under the Penal Law. Because the needle exchange program had not been authorized at that time, and because the statutory language is clear, that case is not controlling.

**16.** As discussed, the NYPD Operations Order instructs officers that an individual in possession of syringes and a participation card should not be arrested if the only charge is criminal possession of a hypodermic instrument. Even where arrest is affected on another charge, authorized participants should not be charged with criminal possession of a hypodermic instrument. The Orders further provide that where verification of the individual's participation or the status of the needle exchange program is needed, the officer

of needle exchange programs to encourage participants to return dirty needles for clean ones, and thereby remove infected equipment from circulation, this construction is necessary. The unrebutted evidence presented indicates that criminalization makes HIV/AIDS reduction far less probable as addicts will simply reuse and share needles for fear of arrest. (SACAC Ex. A, B, and I (discussed above)).

Thus there is no criminal liability under Penal Law § 220.03 for possession of the drug residue remaining in a used needle or syringe in the course of authorized participation in a needle exchange program as envisioned in 10 N.Y.C.R.R. § 80.135. The purpose and intent of the statutes to reduce drug use and the spread of HIV/AIDS are to be given effect, *River Brand v. Latrobe Brewing Co.*, 305 N.Y. 36, 110 N.E.2d 545, 548 (1953), and criminal statutes must be construed narrowly. *Ryan*, 8 N.E.2d at 316.[17]

### The Motion for Qualified Immunity is Denied

 Detective Ho and Officer Hickey have cross-moved for partial summary judgment based on qualified immunity. Given the need for a declaratory judgment on the issue of whether needle exchange participants may lawfully possess used needles containing a residue of drugs, it would be appropriate to grant qualified immunity to Detective Ho and Officer Hickey with respect to any claims arising from that issue.

After Roe identified himself as a needle exchange program participant, in light of the need for the instant declaratory judgment, it cannot be claimed that Roe's right, in the context of participating in a needle exchange program, to possess a dirty needle was "sufficiently clear." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002).

However, on this record there is a factual dispute concerning the circumstances of Roe's arrest. In particular, there is a dispute over whether Roe was injecting himself with drugs or was stopped without reasonable suspicion and searched without probable cause. Qualified immunity will therefore turn on the resolution of this factual dispute.

Section 1983 provides, in relevant part:

Every person who, under color . . . of any state law subjects or causes to be

---

should telephone the relevant numbers provided on the participation card and on the Operations Order. NYPD Operations Order 23 ¶ 7, 8; NYPD Operations Order 70 ¶ 4, 5. In commenting on the Legislature's recent enactment allowing purchase of needles without prescription, the Deputy Commissioner for Legal Matters has stated that "[t]he practical effect of this law is that it creates another lawful means by which a person can possess a hypodermic needle and/or syringe without a prescription, similar to that created by the NYS Department of Health Authorized Syringe Exchange Program . . . As with that program, persons in possession of hypodermic needles and/or syringes pursuant to this new law should *not* be arrested and charged with criminally possessing a hypodermic needle (Penal Law § 220.45) unless other charges (e.g., Criminal Possession of a Controlled Substance) are appropriate." (Def. Notice of Cr. Motion Ex. G (memorandum of Sept. 26, 2000 from Deputy Commissioner Legal Matters George A. Grasso to Chief of Department)).

17. The needle-exchange case in Connecticut, *Doe v. Bridgeport Police Dep't.*, 198 F.R.D. 325 (D.Conn.2001), involves a different statutory scheme than New York's, but that Court still found that "common sense and the requirement that the court assume that the legislature intended to accomplish a reasonable and rational result" require decriminalizing the possession of trace amounts of narcotics. *Id.*, at 349.

subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution ... shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

◼ It is well established that § 1983 is a vehicle that provides redress to a person who was arrested without probable cause, and that the elements of a false arrest claim under § 1983 are substantially the same as the elements under New York State law. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996); *Raysor v. Port Auth. of New York and New Jersey*, 768 F.2d 34, 39–40 (2d Cir.1985), *cert. denied*, 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986). False arrest is the intentional detention of a person against his will and without a privilege to do so. *Oakley v. City of Rochester*, 71 A.D.2d 15, 18, 421 N.Y.S.2d 472 (1979), *aff'd*, 51 N.Y.2d 908, 434 N.Y.S.2d 977, 415 N.E.2d 966 (1980).

As the Supreme Court stated in *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the first question to be considered in evaluating a qualified immunity defense is, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" If so, it must be determined whether that right was clearly established. *Id.* at 202, 121 S.Ct. 2151. "In other words, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Caldarola*, 298 F.3d at 160 (citations omitted).

Viewing the facts in the light most favorable to Roe, he has alleged, *inter alia*, that he was arrested and searched without probable cause, a constitutional violation, based only on his presence in an area known for marijuana use.

◼ Since at least 1979 presence in an area known for criminal activity, standing alone, is not enough to justify even a *Terry* stop, which requires only a reasonable, particularized suspicion that the person is committing a crime. *See Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (investigative stop requires reasonable, particularized suspicion of criminal activity). If Detective Ho's arrest of Roe took place as alleged by Roe, it was unlawful.

It must therefore be determined whether a reasonable officer could have believed that the circumstances established the necessary probable cause for Roe's arrest. *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987) (qualified immunity is warranted if officers of reasonable competence could disagree on whether the probable cause test was met); *see Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful ...").

◼ Defendants also urge that Officer Hickey is protected by qualified immunity. Even if Officer Hickey did not participate in the violations of Roe's constitutional rights, (which, according to Roe's account he did), he is not automatically shielded from liability. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know ... that a citizen has been unjustifiably arrested ... or that any constitutional violation has been committed by a law enforcement offi-

cial." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). Nonetheless, Officer Hickey is shielded from liability based on qualified immunity for claims arising from Roe's liability for arrest based on drug residue remaining in the syringe for the same reasons as discussed with respect to Detective Ho.

The motion for dismissal on the basis of qualified immunity must be denied because of the factual dispute as to the circumstances of the arrest.

### Conclusion

For the foregoing reasons, declaratory judgment will issue to the effect that in the course of authorized participation in a needle exchange program as envisioned in 10 N.Y.C.R.R. § 80.135, there is no criminal liability under Penal Law § 220.03 for possession of a controlled substance based upon the drug residue remaining in a used needle or syringe.

Defendants' motion for summary judgment based on qualified immunity is denied as presenting a factual dispute.

Settle partial judgment on notice.

It is so ordered.